Filed 3/1/24  In re Connor J. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re CONNOR J. et al., Persons Coming Under Juvenile Court Law. | B329833 (Los Angeles County Super. Ct. No. 20CCJP05142) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ERICA G. Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Charles Q. Clay III, Judge.  Affirmed.

Katie Curtis, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

_____

In the proceedings below, after appellant mother Erica G. failed to reunify with her son Connor after being provided more than two years of reunification services, the juvenile court terminated reunification services and set a hearing under Welfare and Institutions Code section 366.26.[1] The court found that Connor could not be released to Mother because, due to his extreme behavior, Mother lacked the ability to keep him safe.

Four months later, Mother filed a petition under section 388 asking for reunification services to be reinstated, for the section 366.26 hearing to be taken off-calendar, and for a hearing to be held to determine whether Connor could safely be returned to her. The court summarily denied the petition, finding it did not "state new evidence or a change of circumstances."

On appeal, Mother contends the court erred in summarily denying her petition because she submitted evidence that she was observed "utiliz[ing] safe play" with Connor, had shown accountability for her "previous shortcomings," had "gained insight" into her role in keeping Connor safe, and had expressed commitment to "a life of learning" in order to best meet Connor's needs. We conclude the court did not abuse its discretion in

_____

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

determining that Mother failed to demonstrate a substantial change in circumstances, and therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. *DCFS Files a Petition*

In September 2020, firefighters summoned to the family home for a medical emergency pertaining to the maternal grandmother reported to the police that "two young minors were being kept in a cage in the kitchen." Police officers responded and found the home to be "extremely dirty," "disgusting," and "dangerous." After a children's social worker (CSW) arrived, a police officer clarified that the "cage" was actually "a jail door blocking the kitchen." One child, Connor (born September 2015), was kept behind the door, and he had "free range of the kitchen that also connects to another room." The other child, Kristopher (born December 2012), was permitted to "roam around the house wherever he wants." Another police officer reported that the maternal uncle, who also lived at the house, had stated the metal door was built two years ago "because Connor would run out of the home." The uncle explained that Connor had been behind the metal door since he was three years old, and "stays there 'from morning to [s]undown.' " Mother told the police that Connor was kept behind the metal door for his own safety, saying that her plan was to wean him off it, and expressing her hope that he would "grow out of it."

The CSW assessed the home, describing it as "in deplorable living condition" because it was "filthy, disorganized and

---

[2] We limit our summary to the facts and procedural history relevant to the issues appellant raises on appeal.

extremely cluttered." The floors were "dirty and stained with a brown sticky residue." In the enclosed kitchen area where Connor was kept, there was "a broken table with broken legs, an electrical outlet with exposed wires and jagged glass on a broken window." There was also writing all over the wall. The kitchen was connected to a living room and a bathroom and the area had a couch and television set. While there was less clutter in this area, "the walls, the floors and the one bathroom in this area were extremely dirty."

Under questioning by the CSW, Mother explained that she lived in the home with the maternal grandparents and the maternal uncle. Besides taking care of the children, Mother also cared for the maternal grandmother, who was disabled and had difficulty moving around the house. Mother claimed that she tried to clean the home as much as possible, but was not permitted to throw away most of the things in the home, because they belonged to the maternal grandmother. Regarding the broken table in the kitchen area, Mother stated that Connor had broken the table a few months ago, and that he had destroyed many other things in the home. While the CSW was present, Connor threw food at her several times, spit out carrots, and spilled water on the floor. Mother stated the bars keeping Connor in the kitchen area were installed a few years ago, after Connor had run out of the house and into the street; Mother asserted that Connor lacked a sense of danger. Mother added that the bars were also there to separate Connor and Kristopher, who fought a lot.

Connor was taken to a medical center for an evaluation. He presented with poor hygiene, wearing wet shorts and a pull-ups diaper wet with urine. When the CSW changed his pull-ups,

4

she noted dry feces around his anus. Connor was "extremely hyperactive" and took Adderall twice daily. While at the medical center, he "ran around uncontrollably," "got on top of chairs [and] tables," "tried to open all doors within his reach," "threw books and food on the floor," and "got into [a] physical altercation with his older sibling." Connor did not follow directions and was uncooperative. He was transported to the emergency room and placed on a 72-hour hold. However, the hospital discharged him the next day and he was transported to shelter care, pending placement with a foster family.

The next day, the CSW received text messages from the maternal uncle, stating that he was being thrown out of the home because Mother claimed he "called the police on her." The uncle informed the CSW that Mother typically "yells and screams [at] those kids from the morning till night" and that rather than take care of them, she was "online with some boys or whatever." He opined that Mother was "not mentally capable of taking care of those kids" and the children "should not be with her."

DCFS filed a petition under section 300, subdivisions (b)(1) and (j), on behalf of both children. Counts b-1 and j-1 identically alleged that, for three years, Mother endangered the children by keeping Connor behind a locked door made of metal bars for extended periods of time, in an area that contained a broken table, an electrical outlet with exposed wiring, and jagged glass from a broken window. Count b-2 alleged that the children's home was in a "filthy, unsanitary and unsafe, hazardous condition," including a "brown sticky residue and feces throughout the home." Additionally, the children were filthy and appeared not to have bathed for days; Connor had dried feces in

his anus and a soiled diaper. The court ordered both children detained from Mother.

### B. *The Court Removes the Children and Orders Reunification Services*

In an interview with a dependency investigator (DI), Kristopher reported that Mother placed Connor in the kitchen area after he awoke because Connor did not listen and would run into the street. Connor confirmed Kristopher's account. Connor was frequently distracted during the DI's interview and the DI observed that "sometimes Connor misbehaves to get a reaction out of the caregiver or adults in the home."

Mother reported that she was often overwhelmed caring for the children and the maternal grandmother. She reiterated that Connor was kept in the kitchen area because otherwise "he would constantly destroy things, hit and fight with his brother, draw all over the walls, and would leave through the front door into the street." Mother told the DI that Connor had been diagnosed with ADHD and ODD (Oppositional Defiant Disorder) and had been taking medication since he was four. Mother said she was willing to do whatever was necessary to have the children reunified with her.

A home inspection revealed that while there had been some improvements—the feces and sticky residue appeared to have been cleaned up—the floors were still dirty and the house "remained in a somewhat hoarder type condition." In the bedroom where Mother and the children slept, at the end of the bed, there were "a pair of shoes, [a] toy metal trumpet, and a pile of dry dog poop."

At the October 2020 jurisdiction hearing, Mother entered a plea of no contest to an amended count b-1, which alleged that,

without proper training, Mother had a limited ability to provide appropriate care and supervision for Connor due to his behavioral issues, including diagnoses of ADHD and ODD, which endangered both children. The court dismissed the remaining counts. Turning to disposition, the court removed both children from Mother. Mother was ordered to take a parenting class for children with special needs as well as to undergo individual counseling.

### C.  *Six-Month Review Hearing*

In an April 2021 status report, DCFS noted that, mostly due to behavioral issues, Connor had been moved several times, and was now in his sixth foster home. DCFS reported that Connor was "finally stabilized in the home of [his] current caregiver" and was "showing great progress with his behavior." Kristopher was on his third foster home.

Mother completed her parenting classes. When asked what she had learned, she responded that time-outs needed to take place in an area without distraction and have a duration commensurate with the child's age, that she should tell the children she loved them, and that she should use positive reinforcement. A CSW observed that it did not appear Mother gained "any new skills or insight as to how to work with her children that do have special needs."

Additionally, Mother was "inconsistent" with statements made to the CSW and to caregivers. For example, Kristopher had informed a CSW that Mother had told him his father tried to kill him. When the CSW asked Mother about this allegation, she denied it. But when a caregiver was monitoring a phone call between Mother and Kristopher and Kristopher asked about this statement, "[M]other would quickly change the subject but would

not deny she had disclosed said information to the child." Mother stated that the children enjoyed watching the television show Supernatural. When told the show was inappropriate for the children's ages, Mother stated the boys never watched it. Mother was seen by Connor's Intensive Field Capable Clinical Services team leaving the home of one of Connor's caregivers but, when asked about this, claimed she would never go to the caregiver's home. Finally, during a visit with Kristopher's newest caregiver, Mother stated that Connor's caregiver would just drop him off for visits, and suggested that Kristopher's new caregiver do the same. When the CSW confronted her about this statement, she admitted it was a lie. When the CSW spoke with Connor's caregiver, that caregiver reported that Mother had told her the same thing about Kristopher's caregiver.

Mother visited with both children. In the one visit monitored by a CSW, Mother was observed "to be very kind but unable to adequately supervise both boys at the same time. During the visit monitored by [the] CSW, the child Connor continuously eloped and both CSW and Mother had to chase after him." While they were doing this, "Kristopher would be observed to also ignore the mother's directions." The remainder of Mother's visits were monitored by each child's caregiver and only consisted of Mother and one child at a time. Both caregivers reported that Mother appeared to be a "trigger for each respective child to misbehave." Moreover, despite Mother being told to not spend her time with the children offering gifts, but instead to talk and play with them, the caregivers observed that during visits and calls, Mother would constantly ask what new toy the child wanted or discuss the plan to buy the toy. They also reported that Mother was unable to manage the children's tantrums, and

8

Mother had commented that "buying the child what he requests is easier th[a]n him having a tantrum."

One of the children's caregivers reported to a CSW that Mother appeared to be "coaching" the kids at times and had said she could get Connor to "do and say what she wants." DCFS also reported that Mother lacked insight into why a case was open, and took no responsibility for the issues that occasioned the case. She blamed the dirty home on the maternal grandmother and failed to acknowledge the children's behavioral issues "were created due to the mother's home having no structure and the mother not setting boundaries."

At the six-month review hearing, the court acknowledged Mother's completion of parenting classes, but found that "those parenting classes clearly ha[ve] not helped the mother gain any insight as to how these children were traumatized and how to better parent them." The court also found that "the extent of progress made towards alleviating or mitigating the causes that necessitated placement for the mother is very minimal." The court ordered continued reunification services.

### D.   *Twelve-Month Review Hearing*

Mother continued visiting with the children separately. At almost every visit, Connor would throw a tantrum when Mother told him "no." Mother was advised not to engage with Connor during these tantrums; when she followed the advice, Connor seemed to have fewer tantrums. Mother's visits with Kristopher went well.

In June 2021, Mother visited both children at the same time. The visit was mostly appropriate, and Mother was able to set "small boundaries" for Connor and to follow through on those

boundaries.  When Kristopher was caught "assaulting" Connor, Mother was able to place Kristopher in a time-out.

In an October 2021 status report, DCFS reported that both children again had to be moved multiple times due to inappropriate behavior; Connor had been placed in his tenth foster home, and Kristopher his sixth.  Connor continued to be destructive, to spit, to curse, and to damage his caregivers' property.  DCFS noted that, with one caregiver, Connor had made significant progress—saying "please" and "thank you" and becoming potty-trained—but after "a special visit with [M]other on his birthday," he "was observed to revert to past behavior."  A week after Mother's visit, Connor began following the rules again.  While the trigger for Connor's reversion was undetermined, the caregiver admitted she had permitted Mother to take Connor to the bathroom on her own, as well as take him to her car to retrieve a gift.

The report also stated that Mother consistently visited both children but "continues to have difficulty in regards to setting boundaries with the children, reprimanding and following through with redirecting the children."  While Mother appeared open to accept help for the children, she "commented that she is scared that the children will resent her if she reprimands them."  Because the children had been placed geographically far apart, Mother visited the children separately.  With Connor, Mother tended to "revert to giving the child her phone to keep him occupied during visits" and needed cues on when to discipline him.  When a "Parent Partner" attempted to speak with Mother about this issue, Mother "responded stating that she was a great parent, only had a case with the Department because of her

10

brother's disclosures and was not going to listen further to Parent Partner Virginia's recommendations."

With Kristopher, Mother was "observed to be appropriate," though Kristopher did not seem interested in engaging with her beyond showing interest in what she might be bringing him (e.g., gifts or special food). When Mother needed to reprimand Kristopher, she would talk to him about his behavior and then place him in time-out. This would cause Kristopher to throw a tantrum and call attention to himself and Mother but, if Mother did not engage, Kristopher would stop.

In a December 2021 twelve-month review hearing, the court ordered reunification services to be continued.

### E.    *Eighteen-Month Review Hearing*

In a March 2022 status report, DCFS informed the court that Connor was still behaving in destructive ways at his caregiver's home and the caregiver reported she could not leave Connor alone. DCFS provided a "1:1 for the overnight hours." Mother still consistently visited with the children, and was still observed "to have difficulty in regards to setting boundaries with the children, reprimanding and following through with redirecting the children." In visits with Connor, it was observed that Mother continued "to struggle with giving in to all of Connor's requests as she states that she gives into most of his requests so that he doesn't have a meltdown or tantrum." However, in contrast to the previous report, DCFS stated Mother now appeared to be "open and willing to accept help in regards to the special needs of her children."

In an April 2022 review hearing, the court ordered that both reunification services and the eighteen-month review hearing date would be continued until September 2022, noting

11

that, as of the next hearing date, the children would have been in "protective custody" for two years.

In a September 2022 status report, DCFS informed the court that Kristopher seemed to be doing well in his caregiver's home, but Connor was still exhibiting challenging behavior. Specifically, "Connor continues to be destructive in the home including scratching the television, breaking a Ring doorbell camera, has broken the toilet, repeatedly throwing various items on the roof of the home, removed the smoke detector from the ceiling, repeatedly breaking the screen to his bedroom window and his closet door. [His caregiver] reported that Connor continues defecating in his underwear on almost a daily basis and has hidden his feces in his room. [His caregiver] has reported that in the past month[,] Connor has begun wetting the bed and peeing on the floor. When [his caregiver] attempted to have Connor clean up after himself for defecating in his underwear, he smeared his feces on the wall. [His caregiver] reports that outbursts happen daily and sometimes multiple times within a day and his triggers are unknown." The report noted that Connor had been placed in 14 different homes since detention. He had been with his current caregiver since January 2022.

Mother was still reported "to have difficulty in regard to setting boundaries with the children, reprimanding and following through with redirecting the children." On a recent visit with Connor, he ran into a parking lot and was almost hit by a car. Although Mother instructed Connor to hold her hand in the parking lot, he refused. He also had a hard time sitting still, jumped around while holding his food, and ate food that he had dropped on the floor. Mother instructed him not to, but he again

ignored her. Throughout the visit, he yelled and cursed and, when Mother attempted to put him in a time-out, ran to a playground area. When the son of Connor's caregiver arrived to pick him up, it was observed that Connor complied with his instructions. In contrast, Mother's visits with Kristopher had gone so well that DCFS liberalized them to unmonitored; his caregiver reported that Kristopher now seemed happier. DCFS recommended that Kristopher be returned to Mother, but that reunification services be terminated as to Connor, and that the court set a hearing under section 366.26.

At a September 2022 review hearing, Kristopher was released to Mother on an "extended visit," and the hearing was continued until November 2022.

In a November 2022 last minute information, DCFS informed the court that Mother had enrolled in a parenting class for children with special needs. The review hearing was continued until December 2022.

In a December 2022 last minute information, DCFS informed the court that Connor was still exhibiting extreme behavioral issues. Mother was attending a parenting class for children with special needs and had attended one session so far. DCFS reported a "slight improvement in regards to the visitation as Connor is able to be redirected from cursing with a couple of prompts and reminders throughout the visit." However, Mother continued to "struggle with consistency of disciplining Connor during the visits when he is behaving in negative manner and . . . [M]other has needed the support of the monitor to redirect Connor and model being consistent."

At the December 2022 eighteen-month review hearing, counsel for DCFS asked that Kristopher be released to Mother,

but that family reunification services be terminated as to Connor and that the court set a hearing under section 366.26.  Connor's counsel agreed, arguing that if, after two years of services, visits with Connor still needed to be monitored, matters were clearly not at a juncture where Connor could be released to Mother.  Kristopher's counsel added that one reason she was comfortable with the release of Kristopher to Mother was because Connor would not be there.

Mother's counsel agreed that Kristopher should be released to Mother but argued that Connor should also be released to her, citing her completion of all court-ordered programs and the lack of a substantial risk to Connor.  Acknowledging the difficulties Mother had with disciplining Connor, Mother's counsel pointed out that these issues were not "specific to Mother."

The court released Kristopher to Mother, but terminated reunification services as to Connor, finding that "essentially, we're out of time."  The court remarked that Connor could not be released to Mother because he "would not be safe at home, that Mother is unable to keep him safe."  The court set a hearing under section 366.26.

### F.   *Mother Files a Section 388 Petition*

In April 2023, Mother filed a petition under section 388, asking the court to reinstate family reunification services, take off-calendar the scheduled section 366.26 hearing, and to set a new hearing to determine whether "Mother's Family Reunification Services have allowed the child to be return to Mother's custody."  Mother argued that, since the time the court terminated reunification services, "Mother has continued to participate in Parenting Class and Support Group for families with children at risk and/or with special needs through the

14

Jeffrey Foundation." Mother had also continued to visit Connor and to remain involved in his care and education. The petition contended Mother's requests were in Connor's best interest because she had "shown accountability for the actions that brought her family before the Court," she had "done what has been asked of her to mitigate or otherwise address those concerns," she was "committed to a life of learning in order to best meet her children's needs as they grow and those needs change," and it would be in Connor's best interest to "grow up with his loving mother and brother."

The petition was supported by a declaration from Mother stating that she had started a parenting class for special needs children and attended a "few classes so far." Mother explained that she had learned "to take deep breaths and use calm voices when redirecting or giving directions" and "the symptoms of ADHD, anxiety, ODD in children and how to communicate with Connor." She additionally learned how to "show love" and "give more positive strokes and use positive and negative consequences." She added she had also learned from having Kristopher back in her custody and being able to put the things she learned into practice. Mother alleged that while visits with Connor were "challenging at first," they were improving, and she was able to redirect Connor to use his words instead of hitting or throwing a tantrum.

Mother attached two letters to her declaration. One confirmed her enrollment and attendance in a parenting class for children with special needs. The second was from an Intensive Field Capable Clinical Services program—a "strength-based, family focused program, which aims to support families and children with complex needs"—in which Connor had been

enrolled since March 2022.  This letter stated that Mother was receptive to advice from the program's "parent partner" and the partner had observed Mother being able to "utilize safe play" and build on her bond with Connor "utilizing communication skills."

The court summarily denied the petition two weeks after it was filed, finding that "the request does not state new evidence or a change of circumstances."  The order was issued on a form with several other boxes that could be checked as a reason for denial, including "the proposed change of order . . . does not promote the best interest of the child," but none were checked.[3]  Mother timely appealed.

## DISCUSSION

"Section 388 allows a parent to petition to change, modify, or set aside any previous juvenile court order.  (§ 388, subd. (a).) 'The petitioner has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances *and* (2) that the proposed modification would be in the best interests of the child.' " (*In re J.M.* (2020) 50

---

[3] The parties disagree as to the significance of the unchecked box next to the statement that Mother's request was not in Connor's best interest.  Mother argues the unchecked box was "either due to the fact that [the court] felt mother had made that prima facie showing [of best interest]" or that "the juvenile [court] did not consider this prong at all."  DCFS counters that, given the court's finding that Mother failed to establish a change of circumstances, the court did not need to consider this prong and additionally, under the doctrine of implied findings, we must infer the trial court made all findings necessary to support its denial of the petition.  Because, as discussed below, we find the court did not err in determining that Mother failed to establish changed circumstances, we need not consider these arguments.

16

Cal.App.5th 833, 845, emphasis in original.) "To support a section 388 petition, the change in circumstances must be substantial." (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.)

"A summary denial of a section 388 petition is reviewed for abuse of discretion." (*In re D.R.* (2007) 155 Cal.App.4th 480, 487.) "A court exceeds the limits of legal discretion if its determination is arbitrary, capricious or patently absurd. The appropriate test is whether the court exceeded the bounds of reason." (*In re L.W.* (2019) 32 Cal.App.5th 840, 851, citing *In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.)

Here, the juvenile court denied Mother's petition because "the request does not state new evidence or a change of circumstances." Mother contends the court erred because she had presented a letter from an Intensive Field Capable Clinical Services program attesting to Mother's ability to "utilize safe play" and she had also "accepted accountability for her previous shortcomings; showed heartfelt tenderness and acceptance of her child's difficulties; had gained insight into the requirements of her role in keeping Connor safe; and expressed commitment to 'a life of learning in order to best meet her children's needs as they grew and those needs changed.' " We discern no error.

"A parent establishes a substantial change of circumstances for purposes of section 388 by showing that, during the period between termination of reunification services and the permanency planning hearing, he or she has resolved the previously unresolved issues supporting juvenile court jurisdiction." (*In re J.M.*, *supra*, 50 Cal.App.5th at p. 846.) Here, jurisdiction over Connor was established due to Mother's limited ability to provide appropriate care and supervision. This concern was still present when the court terminated family reunification

17

services without releasing Connor to Mother—the court expressly remarked on Mother's inability to keep Connor safe at home. While Mother did present evidence that she was now able to safely play with Connor for a few hours a week during a monitored visit, that is a far cry from being able to keep Connor safe as his primary caregiver. This is especially true when Mother was already responsible for Kristopher, a child with his own behavioral issues, and who had never been successfully housed with Connor. Indeed, one justification that Mother gave for sequestering Connor in the kitchen area behind metal bars was that the boys fought a lot.

Mother's claim that she had shown accountability for her previous shortcomings, empathized with Connor's difficulties, gained insight into her role in keeping Connor safe, and was committed to learning how to meet his needs, also do not constitute a substantial change. Indeed, many of Mother's statements do not constitute a change at all. In March 2022, nine months before reunification services were terminated, DCFS reported that Mother appeared "open and willing to accept help in regards to the special needs of her children" and since the inception of the case, Mother had said she was willing to do whatever was necessary to have the children reunified with her. Mother had completed her parenting classes by the six-month review hearing, and had been enrolled in a parenting class for children with special needs in November 2022, one month before services were terminated.[4] Nor is there any evidence to suggest that, prior to the termination of services, Mother was ignorant of

_____

[4] Indeed, Mother herself contends that she completed all her court-ordered programs.

the role she would play in Connor's safety if he were released to her, or that she did not empathize with and accept Connor's issues.

We conclude the juvenile court acted well within the bounds of reason in determining Mother failed to demonstrate a substantial change in circumstances.  It therefore did not abuse its discretion in summarily denying Mother's section 388 petition.

### DISPOSITION

The court's order is affirmed.
NOT TO BE PUBLISHED

CHANEY, J.

We concur:

BENDIX, Acting P. J.

WEINGART, J.

19